Christopher C. Ehrman (pro hac vice)
Jacob D. Krawitz (pro hac vice)
Brian T. Fitzsimons (pro hac vice)
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Tel.  202-551-4590

Thomas M. Melton (4999)
Attorney for Plaintiff
U.S. Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel.  801-524-5796

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> PLAINTIFF, <br><br> v. <br><br> BRIAN J. SMART, and <br> SMART ASSETS, LLC, a California limited liability company, <br><br> DEFENDANTS. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br><br><br><br><br> Civil No. 2:09cv00224 (DAK) <br><br> Judge Dale A. Kimball |

---

This matter is before the court on the Securities and Exchange Commission's (the

"Commission") Motion for Summary Judgment, Defendants Brian J. Smart and Smart

Assets, LLC's Cross-Motion for Summary Judgment.   A hearing on the motions was held

on April 28, 2011.   At the hearing, the Commission was represented by Brian T.

Fitzsimons and Thomas M. Melton.   Defendants were represented by Steven G. Loosle.

Before the hearing, the court carefully considered the memoranda and other materials

submitted by the parties.  Since taking the motions under advisement, the court has further considered the law and facts relating to these motions, along with the proposed orders and proposed findings of fact and conclusions of law submitted by the parties.  Now being fully advised, the court renders the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### I.    <u>Jurisdiction and Venue</u>

1.     This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act of 1933 (15 U.S.C. §§ 77t(d)(1) and 77v(a)) and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78u(d), 78u(e), and 78aa).  Defendants, directly or indirectly, have made use of the means in instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices and courses of business alleged in this Complaint.

2.     Venue in this Court is proper pursuant to Section 22(a) of the Securities Act of 1933 (15 U.S.C. § 77v(a)) and Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa), because certain of the conduct alleged in this Complaint took place within the District of Utah.

### II.    <u>Defendants</u>

3.     <u>Brian J. Smart</u>:  Defendant Smart is a resident of Lehi, Utah.  <u>See</u> Declaration of Brian T. Fitzsimons ("Fitzsimons Decl. 1") at ¶ 7.

4.     <u>Smart Assets, LLC</u>:  Defendant Smart Assets, LLC is a private, limited liability company registered in the State of California.  Smart is believed to

be the only member of Smart Assets and manages Smart Assets through various locations within Utah.  See Fitzsimons Decl. 1 ¶ 6-7.

## III.  Smart's Misrepresentations and Omissions

### A.  Katherine Logan Brown

5.      In March 2001, Smart, acting as an insurance salesman for AIM Association, Inc. ("AIM")—an insurance brokerage located in California—sold an $100,000 annuity to Paul Brown and Katherine Brown.  See Fitzsimons Decl. 1 ¶ 12 (August 25, 2009).

6.      In April 2003, Smart convinced the Browns to cancel their annuity at a loss by telling them that he would invest their money in investment products that would provide steady income for retirement.  See Fitzsimons Decl. 1 ¶ 12.

7.      The Browns invested an additional $80,000 with Smart based on his misrepresentations.  See Exhibit 34 to Fitzsimons Decl. 1 ¶ 12.

8.      In 2005, Paul Brown died, and Smart convinced Katherine Brown ("Brown") to invest the death benefit from his insurance policy of over $145,000 with him by misrepresenting to Brown that the money would be invested in an "S & P" index mutual fund and other securities, and that he would invest the majority of the money in a safe investment.  See Exhibit 34 to Fitzsimons Decl. 1 ¶ 12.

9.      Brown's money was not used as Smart represented.  See e.g. Exhibit 41 to Fitzsimons Decl. 2.

10.     Brown's money was pooled with the money of other investors, and the pooled funds were used for (1) Smart's personal expenses; (2) investment in real estate; (3) hard money loans; (4) investment in high risk companies; and (5) to pay other investors. See e.g. Exhibits 6, 12, 18, 19, 22-25, 28-31 to Fitzsimons Decl. 1; Exhibits 34, 36-37 to Fitzsimons Decl. 2 (February 26, 2010); see generally Exhibit 39 to Fitzsimons Decl. 2.

11.     At deposition, when asked about whether he invested her money in a low risk mutual fund, used her money for his own personal expenses, used her money to invest in real estate, used her money to make hard money loans, and pooled her money with other investor money, Smart asserted his Fifth Amendment privilege. See e.g. Exhibit 41 to Fitzsimons Decl. 2 at 127:14-16; 135:9-12; 139:7-9; 141:11-13; 139:14-17.

12.     In order to further his scheme and deception, Smart gave Brown fabricated account statements that misstated, among other things, the balance of her account and the interest rate earned on her account.  See Exhibit 2 to Fitzsimons Decl. 1.

13.     Brown made repeated requests for account information that Smart would not honor. See Exhibit 1 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2.

14.     Smart did not keep adequate books and records, he commingled investor funds, and he recreated company records during discovery.  See Exhibit 26 to Fitzsimons Decl. 1.

15.     The false account statements gave the appearance that Brown's money was held in a separately managed account and invested in securities offering fixed rates of return.  See Fitzsimons Decl. 1 ¶ 13.

16.     Brown's money was not used as Smart represented and was not held in a separate account.  See Fitzsimons Decl. 1 ¶ 15.

17.     Smart repeatedly asserted the Fifth Amendment privilege at deposition when asked about whether the account statements were fabricated and whether he designed the statements to mislead investors.  See Exhibit 41 to Fitzsimons Decl. 2 at 134:20-22; 142:5-7; 163:21-23; 180:8-11.

18.     Smart also furnished Brown with a fabricated product information sheet, describing the non-existent Smart Assets, LLC product "Safe Guard VI," which stated that "[c]lients can realize above average returns without risking loss of principal" and that it is "[d]esigned for clients primarily interested in a fixed rate strategy."   See Exhibit 3 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2.

### B.  Lisa Maria Padilla

19.     In 2004, Smart met with Lisa Maria Padilla ("Padilla") and her mother Virginia, and convinced them to invest the assets of the Padilla Family Trust—approximately $1.1 million dollars—in an annuity.  See Fitzsimons Decl. 1 ¶ 17.

20.     At this time, Smart still worked as an insurance salesman with AIM.  See Fitzsimons Decl. 1 ¶ 17.

21.     Shortly thereafter, in or around September 2004, Smart left AIM.   See Fitzsimons Decl. 1 ¶ 17.

22.     In March 2005, Padilla was appointed sole trustee of the family trust.  See Fitzsimons Decl. 1 ¶ 17.

23.     Smart, still holding himself out as being affiliated with AIM, convinced Padilla to invest the trust assets with him based on myriad misrepresentations.  See Fitzsimons Decl. 1 ¶ 17.

24.     Smart memorialized the conversation in an email that he sent to Padilla, stating: (1) that her money would be invested "into Low [sic] risk or fixed funds offering Principal [sic] guaranteed protection with above average returns;" (2) that the fixed rate funds offer 5.5% returns; (3) that her remaining $425,000 would be invested with a "ROI (return on investment) company called Golden Key investments [sic]" offering "principle [sic] guaranteed product;" (4) that the investments were "very solid and safe;" and (5) that the investment could be "turned into a stretch IRA, passing the gains tax free to it's [sic] beneficiaries."  See Exhibit 5 to Fitzsimons Decl. 1; Exhibit 37 to Fitzsimons Decl. 2.

25.     Padilla's money was not used as Smart represented and was not held in a separate account.  See Fitzsimons Decl. 1 ¶ 18.  Padilla's money was pooled with other investors' money and was used for highly speculative investments, Smart's personal expenses, and to pay other investors.  See Exhibits 6, 12, 18, 19, 22-25, 28 to Fitzsimons Decl. 1; Exhibits 37, 39 to Fitzsimons Decl. 2.

26.     Padilla made repeated requests for account information that Smart would not honor. See Exhibit 4 to Fitzsimons Decl. 1; Exhibit 37 to Fitzsimons Decl. 2..

27.     At the deposition of Smart Assets, Smart admitted that approximately $870,000 of Padilla's money was used to make a failed "hard money" loan.  See Exhibit 21 to Fitzsimons Decl. 1 at 84:6-20.

### C. Dagmar Chaplin-Lee

28.     Smart met Dagmar Chaplin-Lee ("Lee") in early 2005, and by November of 2005, had convinced her to invest $200,000 with him by telling her that: (1) he would put the money in safe investments; (2) she would always have access to her money; (3) he was going to make Brown and Lee millionaires; and (4) he was still affiliated with AIM. <u>See</u> Exhibit 7 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2; Exhibit 35 to Fitzsimons Decl. 2.

29.     To make Lee "comfortable" with the investment, Defendants entered into a promissory note agreement with Lee and gave her a membership certificate purporting to give her 200,000 units of membership in Smart Assets. <u>See</u> Exhibits 8 and 10 to Fitzsimons Decl. 1. The note promised a fixed rate of 8.5% per year. <u>See</u> Fitzsimons Decl. 1 ¶ 21.

30.     As collateral for the note, Defendants offered a defaulted $870,000 promissory note. <u>See</u> Fitzsimons Decl. 1 ¶ 21. Smart did not disclose to Lee that this note was already in default.

31.     In order to further his scheme and deception, Smart gave Lee fabricated account statements containing various misstatements. <u>See</u> Exhibits 7 and 9 to Fitzsimons Decl. 1 ¶ 21.

32.     The account statements gave the appearance that Lee's money was held in a separately managed account and invested in securities offering an annual interest rate of 20.65%. <u>See</u> Exhibit 9 to Fitzsimons Decl. 1; Fitzsimons Decl. 1 ¶ 21.

33.     Lee made repeated requests for account information that Smart would not honor. See Exhibits 7 to Fitzsimons Decl. 1.

34.     In February 2006, based on Smart's prior misrepresentations, Lee invested another $50,000 with Smart through a promissory note offering an 18% annual rate. See Exhibit 11 to Fitzsimons Decl. 1.

35.     Lee's money was pooled with other investors' money and used for highly speculative investments, Smart's personal expenses, and to pay other investors. See Fitzsimons Decl. 1 ¶ 23; Exhibits 6, 12, 18, 19, 22-25, 28-31 to Fitzsimons Decl. 1.

36.     In February 2008, Smart admitted to Lee that her and Brown's assets were not placed in low risks funds or investments, but were instead invested in a Hawaiian real estate deal. One month later, Smart told Lee that they were also invested in a company called Pharma Meds. See Exhibit 7 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2; Exhibit 34 to Fitzsimons Decl. 2.

### D.  Morris and Mary Jo O'Brien

37.     The O'Briens held an annuity that they purchased through an agent at an insurance brokerage named Asset Protection and Insurance Services ("APIS"). See Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

38.     When that agent left APIS, Smart was assigned to them as their representative. See Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

39.     Smart convinced the O'Briens to cancel their annuity and invest the money with him by telling them that such an investment would be just as safe.  <u>See</u> Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

40.     Smart misled the O'Briens by representing that he was a financial advisor and by claiming that they would be investing in a reputable company named Smart Assets. <u>See</u> Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

41.     Smart failed to disclose to the O'Briens that Smart Assets was a company that was owned and controlled by Smart.  <u>See</u> Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2; Exhibit 40 to Fitzsimons Decl. 2.

42.     Pursuant to several promissory notes offering between 12% and 15% interest per year, the O'Briens invested with Smart over $126,000 based on his misstatement.  <u>See</u> Exhibit 13 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

43.     Smart gave the O'Briens fabricated account statements containing various misstatements.  <u>See</u> Exhibit 14 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

44.     The statements gave the appearance that the O'Briens's money was held in a separately managed account and invested in securities offering an annual fixed interest rate of 12%.  <u>See</u> Fitzsimons Decl. 1 ¶ 26; Exhibit 40 to Fitzsimons Decl. 2.

**E. Ryan and Joanna Smith**

45.     In July 2006, Smart solicited Ryan and Joanna Smith (the "Smiths") to invest in "hard money" real estate lending.  <u>See</u> Exhibit 16 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2; Exhibit 36 to Fitzsimons Decl. 2.

46.     In August 2006, Smart offered and sold a $100,000 promissory note to the Smiths, offering a 10% per month rate of return.  <u>See</u> Exhibit 17 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2.

47.     While Smart made some of the monthly payments on the note, the payments stopped in January 2008.  <u>See</u> Exhibit 16 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2; Exhibit 36 to Fitzsimons Decl. 2.

48.     Eighteen months after their supposed real estate investment, Smart informed the Smiths that, rather than investing their money in real estate as he had promised, their money was invested in a company that manufactures "slurry ice."  <u>See</u> Exhibit 16 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2; Exhibit 36 to Fitzsimons Decl. 2.

**F. Ida Wilson**

49.     In December 2005, Ida Wilson ("Wilson") invested $165,000 with Smart and Smart Assets on the assurance that the investment was "safe".  Wilson has not received any of her money back.  <u>See</u> Exhibit 32 to Fitzsimons Decl. 1; Exhibit 38 to Fitzsimons Decl. 2; Exhibit 38 to Fitzsimons Decl. 2.

## IV.     Smart Received over $2.3 Million from Misled Investors

50.     Brown gave Smart $325,126 in total.  <u>See</u> Exhibit 1 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2.

51.     Lee gave Smart $251,039 in total.  <u>See</u> Exhibit 7 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2.

52.     Padilla gave Smart $1,372,798 in total.  <u>See</u> Exhibit 4 to Fitzsimons Decl. 1; Exhibit 37 to Fitzsimons Decl. 2.

53.     The O'Briens gave Smart $126,764 in total.  <u>See</u> Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

54.     Ida Wilson gave Smart $165,000 in total. <u>See</u> Exhibit 32 to Fitzsimons Decl. 1; Exhibit 38 to Fitzsimons Decl. 2.

55.     The Smiths gave Smart $100,000 in total.  <u>See</u> Exhibit 16 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2.

## V.     Smart Paid Investors from an Account Consisting of Pooled Investor Funds

56.     Smart pooled investor money in the Smart Assets, LLC bank account at Wells Fargo.  <u>See</u> Exhibits 6, 12, 18, 19, 22-26 to Fitzsimons Decl. 1; Exhibit 37 to Fitzsimons Decl. 2; <u>see generally</u> Exhibit 39 to Fitzsimons Decl. 2.

57.     In September 2008, Smart's counsel at the time sent Padilla a letter dated September 17, 2008 stating that her funds were pooled with the funds of other investors, and that there are "no 'official' documents stating the location of [her] funds."  <u>See</u> Exhibit 19 to Fitzsimons Decl. 1; Exhibit 37 to Fitzsimons Decl. 2.

58.     Both Padilla and Brown received "dividend" payments from Smart.  The payments came from the Smart Assets bank account where the investor money was pooled. <u>See</u> Exhibits 6, 23-24 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

59.     Lee received payments from the Smart Assets bank account where the investor money was pooled.  <u>See</u> Exhibits 12 and 25 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

60.     Since 2007, Lee repeatedly requested that Smart provide account information on her investments and did not received any such information.  <u>See</u> Fitzsimons Decl. 1 ¶ 25; Exhibit 7 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2; Exhibit 35 to Fitzsimons Decl. 2.

61.     The Smiths received payments from the Smart Assets bank account where the investor money was pooled.  <u>See</u> Exhibits 16 and 22 to Fitzsimons Decl. 1; Exhibit 36 to Fitzsimons Decl. 2.

## VI.     <u>Smart Misappropriated over $2.05 Million from Misled Investors</u>

62.     Padilla gave Smart $1,372,798 and received twenty-three "dividend" payments from the Smart Assets bank account totaling $78,970.  Smart thus misappropriated $1,293,828 from Padilla.  <u>See</u> Fitzsimons Decl. 1 ¶ 46; Exhibit 23 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

63.     Brown gave Smart $325,126 and received "dividend" payments from Smart totaling $88,180.  Smart thus misappropriated $236,945 from Brown.  <u>See</u> Fitzsimons Decl. 1 ¶ 47; Exhibit 24 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

64.     Lee gave Smart $251,039 and received nine "dividend" payments from the Smart Assets bank account totaling $52,500.  Smart thus misappropriated $198,539 from Lee.  <u>See</u> Fitzsimons Decl. 1 ¶ 48; Exhibit 25 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

65.     Ida Wilson gave Smart $165,000 and received no money back.  Smart thus misappropriated $165,000 from Wilson.  <u>See</u> Exhibit 32 to Fitzsimons Decl. 1; Exhibit 38 to Fitzsimons Decl. 2.

66.     The O'Briens gave Smart $126,764 and received no money back.  Smart thus misappropriated $126,764 from the O'Briens.  <u>See</u> Exhibit 15 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2.

67.     The Smiths gave Smart $100,000 and received "dividend" payments from Smart totaling $62,000.  Smart thus misappropriated $38,000 from the Smiths.  <u>See</u> Exhibit 16 to Fitzsimons Decl. 1; Exhibits 36 and 39 to Fitzsimons Decl. 2.

## VII.     <u>Smart did not Track, Record, or Monitor Investor Money</u>

68.     Smart did not track, record, or monitor the status of money he collected from his clients.  <u>See</u> Exhibit 26 to Fitzsimons Decl. 1.

69.     Investors made repeated requests for account information to Smart that he did not satisfy.  <u>See</u> Fitzsimons Decl. 1 ¶ 19; Exhibits 1, 4, 7 to Fitzsimons Decl. 1.

70.     Smart gave Brown false account statements containing: (1) fabricated account balances; (2) fabricated interest earned amounts; (3) fabricated interest rate figures; and (4) fabricated account term figures.  The account statements referenced

"account activity" and "withdrawals, transfers and deposits" regarding Brown's "Non-Qualified" Smart Assets account and listed her account number as P1003049. This gave the impression that Brown had a separate account where her assets, account values, and account activity were tracked and recorded by Smart and where her assets were held in trust. See Exhibit 14 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2; Fitzsimons Decl. 2 ¶ 6.

71.     Smart gave Lee false account statements containing: (1) fabricated account balances; (2) fabricated interest earned amounts; and (3) fabricated interest rate figures. The account statements referenced "account activity" and "withdrawals, transfers and deposits" regarding Lee's "Non-Qualified" Smart Assets account and listed her account numbers as P1005187 and P1005196. This gave the impression that Lee had separate accounts where her assets, account values, and account activity were tracked and recorded by Smart and where her assets were held in trust. See Exhibit 9 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2.

72.     Smart gave the O'Briens false account statements containing: (1) fabricated account balances; (2) fabricated interest earned amounts; (3) fabricated interest rate figures; and (4) fabricated account term figures. The account statements referenced "account activity" and "withdrawals, transfers and deposits" regarding the O'Briens's "Qualified" Smart Assets account and listed their account numbers as SA13789118 and SA13789119. This gave the impression that the O'Briens had a separate account, where their assets, account values, and account activity were tracked and recorded by Smart and where their assets were held in trust. See Exhibit 14 to Fitzsimons Decl. 1; Exhibit 40 to Fitzsimons Decl. 2; Fitzsimons Decl. 2 ¶ 9.

## VIII. Smart Gave at least one Investor a False and Misleading Product Information Sheet

73.     Smart gave Brown a false and misleading product information sheet referencing a fabricated Smart Assets investment product called "Safe Guard VI."  The sheet explained that "[c]lients can realize above average returns without risking loss of principal."  See Exhibit 3 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2.

74.     The product information sheet also listed Brown's account number as P10043039, which is different than the account number of P1003049 listed on the fabricated account statements.  See Exhibit 3 to Fitzsimons Decl. 1; Exhibit 34 to Fitzsimons Decl. 2; Fitzsimons Decl. 2 ¶ 6.

## XI. Smart Gave at least one Investor a False and Misleading Membership Certificate

75.     Smart gave Lee a certificate for 200,000 units of membership in Smart Assets.  She is not, and has never been, a member of Smart Assets.  See Exhibit 10 to Fitzsimons Decl. 1; Exhibit 35 to Fitzsimons Decl. 2.

## X.     Smart used Investor Money for his own Personal Expenses

76.     Smart transferred $114,091 in investor money from his Smart Assets bank account to his personal checking account.  Much of this money was used for personal and family expenses.  See Exhibit 27 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

77.     Smart used his Smart Assets bank account check card for: $40,183 in personal credit card payments; $16,728 in retail purchases; $17,757 in personal mortgage expenses; $2,762 for restaurants; $2,367 for gas; $2,109 for hotels; $1,606 for car rentals;

$1,426 for phone bills; and $6,245 in other personal expenses. <u>See</u> Exhibit 28 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

78.     Smart used investor money to pay for his wife's personal expenses. From the Smart Assets bank account, Smart wrote checks to Kelly Smart totaling $26,400 and made $3,012 in payments to her personal credit card. <u>See</u> Exhibits 28 and 29 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

**XI.     <u>Smart used Investor Money for Personal Expenses, to Invest in Real Estate, to make "Hard Money" Loans, and to make Highly Speculative Investments in Companies</u>**

79.     Smart withdrew $1,193,921 from the Smart Assets bank account. This money was used for personal expenses, investment in real estate, to make "hard money" loans, and to invest in failed companies. <u>See</u> Fitzsimons Decl. 1 ¶ 56 and Exhibits 28, 30, 31 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

80.     Smart wired $461,700 from his Smart Assets bank account for use in real estate investment and to make highly speculative investments in companies. The bulk of this money went to American Enterprise Investment Services, Inc., Fuerte Real Estate Investment Group, Golden Key Investments, Metro National Title Trust, Jake Consulting Int., and First Guarantee Capital. <u>See</u> Exhibit 31 to Fitzsimons Decl. 1; Exhibit 39 to Fitzsimons Decl. 2.

81.     Smart used investor money to invest in real estate in Coalville, Utah, and may have used investor money to invest in real estate in Draper, Utah, Park City, Utah, and Maui, Hawaii. <u>See</u> Fitzsimons Decl. 1 ¶ 58; Exhibit 41 to Fitzsimons Decl. 2 at 33; Exhibit 34 to Fitzsimons Decl. 2.

82.     Smart used investor money to make highly speculative investments in companies including Pharma Meds, Inc., McFarland and Hullinger, Inc., and Vision Natural, Inc.  See Fitzsimons Decl. 1 ¶ 59.  See e.g. Exhibit 34 to Fitzsimons Decl. 2; Exhibit 41 to Fitzsimons Decl. 2 at 33, 160-61.

## XII.    Smart's Activities Were "In Connection With" the Purchase or Sale of Securities

83.     Smart sold promissory notes to investors.  See e.g. Fitzsimons Decl. 1 ¶ 8; Exhibits 8, 11, 13, 17 to Fitzsimons Decl. 1; Exhibits 34-38, 40 to Fitzsimons Decl. 2.

84.     Smart told investors that he was going to invest their money in securities, including mutual funds.  See e.g. Fitzsimons Decl. ¶ 12; Exhibit 5 to Fitzsimons Decl. 1; Exhibits 34 and 37 to Fitzsimons Decl. 2.

## XIII.   Smart's Assertion of the Fifth Amendment

85.     After repeated postponements granted by the Commission at the request of Smart and his lawyers, Smart was noticed for his deposition on June 3, 2009, pursuant to Rule 30 of the Federal Rules of Civil Procedure.  See Fitzsimons Decl. 1 ¶ 36.  Smart failed to appear.  See Fitzsimons Decl. 1 ¶ 36.  On the following day, Smart attended the Rule 30(b)(6) deposition of Smart Assets as the company's sole controlling member.  See Fitzsimons Decl. 1 ¶ 36.  At the deposition, Smart asserted his Fifth Amendment privilege against self incrimination with regard to numerous questions touching several subjects that incriminated him personally, including the following:

A. the Smart account statements given to investors; see Exhibit 20 to Fitzsimons Decl. 1 at 84:24-85:25; 120:12-25; 170:15-21; 174:20-175:1.

B. the product information sheet given to Brown; <u>see</u> Exhibit 20 to Fitzsimons Decl. 1 at 125:11-18.

C. the promissory notes that he sold to investors; <u>see</u> Exhibit 20 to Fitzsimons Decl. 1 at 167:15-22; 169:5-24.

D. the membership certificate that he issued to Lee; <u>see</u> Exhibit 20 to Fitzsimons Decl. 1 at 90:6-12.

E. what he told investors when soliciting their investments; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 93:7-15; 135:3-5; 140:21-24; 147:12-15; 162:9-16; 167:5-7.

F. how he invested investor money, <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 135:6-8; 154:22-24; 170:9-11; and

G. how he otherwise used investor money. <u>See, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 93:16-18; 94:13-16; 94:23-25.

86. Specifically, Smart asserted the Fifth Amendment when questioned regarding:

A. whether he told investors he was going to invest their money in safe, principal-guaranteed investments; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 93:7-15; 135:3-5; 140:21-24; 147:12-15; 162:9-16; 167:5-7.

B. whether he used investor money for his own personal use; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 93:16-18; 139:14-17; 158:5-7; 162:24-163:1; 179:11-13.

C. whether he used investor money to invest in real estate; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 94:13-16; 135:9-12; 141:8-10; 163:2-4; 179:14-16.

D. whether he used investor money to invest in hard lending; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 94:23-25; 141:11-13; 163:5-7; 179:17-19.

E. whether he misled investors regarding how he was going to use their money; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 93:11-15; 141:18-20; 162:17-19; 181:7-9; 261:10-25.

F. whether he commingled investor money in a single account; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 92:22-93:2; 141:21-23; 163:11-14: 179:23-25.

G. whether he gave investors false and misleading account statements; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 134:20-22; 142:5-7; 163:21-23; 180:8-11.

H. whether he gave investors false and misleading product information sheets; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 128:2-4; 142:11-13; 164:7-9; 180:16-19.

I. whether he paid investors with other investor money; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 95:5-10; 142:14-16; 139:18-20; 158:8-10; 179:20-22.

J. whether he misled investors to think that he was affiliated with AIM after he left AIM; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 96:14-17; 98:2-6; 138:24-139:3; 156:21-24; 164:10-13; 180:20-23.

K. whether he routinely misled investors regarding the status of their investments; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 143:17-20; 165:5-8; 181:10-12.

L. whether he transferred investor money into his personal checking account; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 247:16-20; 247:25-248:3; 248:13-16; 248:19-22; 249:14-20; 258:17-19; 259:9-12.

M. whether he used investor money to pay his mortgage; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 250:22-251:1; 251:5-15; 251:18-25; 254:6-8.

N. whether he used investor money to pay his personal credit cards; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 245:9-14; 252:20-25; 253:11-13; 256:12-17; 259:20-22.

O. whether he used investor money to pay his wife's personal credit cards; <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 253:7-10.

P. whether he used investor money to issue a $23,000 check to his wife, <u>see, e.g.,</u> Exhibit 20 to Fitzsimons Decl. 1 at 240:16-241:2; 242:15-23; and

Q. whether he orchestrated a scheme to defraud investors. <u>See</u> Exhibit 20 to Fitzsimons Decl. 1 at 260:11-17.

## XIV.   <u>Smart Acted with Scienter</u>

87.    Smart controlled all aspects of Smart Assets, LLC.   <u>See e.g.</u> Fitzsimons Decl. 1 ¶ 60; Exhibit 41 to Fitzsimons Decl. 2 at 30:1-4.

88.     Smart intentionally misled investors regarding how he was going to invest their money.  See e.g. Exhibit 20 to Fitzsimons Decl. 1 at 93:11-15; 95:1-4; 165:9-12.

89.     Smart gave investors false account statements in order to mislead them.  See e.g. Exhibit 20 to Fitzsimons Decl. 1 at 121-24; 133-34.

90.     Smart gave investors fabricated production information sheets in order to mislead them.  See e.g. Exhibit 20 to Fitzsimons Decl. 1 at 127-28; 140-41.

91.     Smart gave Lee a membership certificate in Smart Assets to mislead her into investing money.  See e.g. Exhibit 20 to Fitzsimons Decl. 1 at 90:22-24.

92.     Smart held himself out to investors as a financial advisor in order to mislead them.  See e.g. Exhibit 20 to Fitzsimons Decl. 1 at 96:14-17.

93.     Smart told investors that their investments would be allocated to low risk funds with principal-guaranteed protection.  However, Smart knew that the money was either being invested in (1) real estate; (2) high risk companies; or (3) hard money lending; or being used to (4) pay his own personal expenses.  See Fitzsimons Decl. 1 ¶ 64.  See e.g. Exhibits 6, 12, 18, 19, 22-25, 28-31 to Fitzsimons Decl. 1; Exhibits 34, 36-37 to Fitzsimons Decl. 2 (February 26, 2010); Exhibit 21 to Fitzsimons Decl. 1 at 84:6-20; Exhibit 39 to Fitzsimons Decl. 2.

94.     Smart did not disclose to Lee that her promissory note was secured with an $870,000 promissory note that was already in default.  See Fitzsimons Decl. 1 ¶ 65; Exhibit 7 to Fitzsimons Decl. 1; Exhibit 41 to Fitzsimons Decl. 2 at 83:2-4.

## XV.    Smart Operated as a Ponzi Scheme

95.    Smart paid investors with other investor money.  Smart pooled investor money, and made "dividend" payments to some of the investors from the pooled funds. See e.g. Fitzsimons Decl. 1 ¶ 66; Exhibits 6, 12, 18, 19, 22-25 to Fitzsimons Decl. 1; Exhibits 37, 39 to Fitzsimons Decl. 2.

## PROPOSED CONCLUSIONS OF LAW

### I.    No Material Issue of Fact Separates the Parties

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if the moving party demonstrates that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Dreiling v. Peugeot Motors of Am., Inc., 850 F.2d 1373, 1377 (10th Cir. 1988).

Rule 56(e) further states that "[w]hen a motion for summary judgment is made and supported as provided in this rule . . . the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  In other words, once the moving party has demonstrated that there are no issues of material fact in dispute, the burden shifts to the opposing party "to come forward with specific facts showing that there remains a genuine factual issue for trial."  SEC v. Murphy, 626 F.2d 633, 640 (9th Cir. 1980).  Furthermore, the

opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." Anderson, 477 U.S. at 252. Rather, "[t]here must . . . be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).

Summary judgment is an appropriate device in actions brought by the Commission alleging securities fraud. See, e.g., SEC v. Carnicle, 2000 U.S. App. LEXIS 14380 (10th Cir. 2000); SEC v. Bonastia, 614 F.2d 908 (3d Cir. 1980); SEC v. Spence & Green Chem. Co., 612 F.2d 896 (5th Cir. 1980), cert. denied, 449 U.S. 1082 (1981); SEC v. Research Automation Corp., 585 F.2d 31, 32 (2d Cir. 1978). Where, as here, the government sues under a prophylactic or remedial statute for the vindication of the public interest, summary judgment is an effective tool which enables an enforcement agency with limited manpower and resources to police serious violations of the law where no contested, material evidentiary facts exist. See, e.g., SEC v. Geyser Minerals Corp., 452 F.2d 876 (10th Cir. 1971); United States v. Papercraft Corp., 393 F. Supp. 408 (W.D. Pa. 1975) (reversed on separate grounds regarding penalty calculation), rev'd, 540 F.2d 131 (3d Cir. 1976), remanded to 426 F. Supp 916 (W.D. Pa. 1977).

The foregoing findings of fact underline that the Commission has presented undisputed evidence that Smart violated Section 17(a) of the Securities Act of 1933, 15

U.S.C. § 77q(a) ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934,

15 U.S.C § 78j(b) ("Exchange Act"), and Rule 10b-5 thereunder.

II.     **Smart Violated the Antifraud Provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder**

In proving that Smart violated Sections 17(a) of the Securities Act and 10(b) of the

Exchange Act, the Commission established that (1) in connection with the offer or sale of

securities; (2) Smart engaged in a scheme to defraud when he made untrue statements,

omitted material facts, and engaged in transactions, practices or courses of business that

operated as a fraud or deceit upon the investor; that (3) Smart's misrepresentations or

omissions were material, such that a reasonable investor would consider the

misrepresented or omitted facts to be important in making an investment decision, TSC

Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Basic, Inc. v. Levinson, 485 U.S.

224, 231-32 (1988); and that (4) Smart acted with the requisite scienter, in that he intended

to deceive, manipulate or defraud investors, and acted recklessly.  Aaron v. SEC, 446 U.S.

680, 701 (1980); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Edward J.

Mawod & Co. v. SEC, 591 F.2d 588, 595-97 (10th Cir. 1979) (scienter defined as reckless

conduct).

    **A.  Smart Sold Securities**

The Commission has presented undisputed evidence that Smart sold promissory

notes to investors, and that he told investors that he was going to invest their money in

securities, including mutual funds.

The promissory notes that Defendants offered and sold are securities as either notes

or investment contracts.  In assessing whether an investment is a security, the United States

Supreme Court has noted that the fundamental purpose of the Securities Acts is "to

eliminate serious abuses in a largely unregulated securities market." United House Found., Inc. v. Forman, 421 U.S. 837, 849 (1975). In defining the scope of the products Congress wished to regulate, Congress painted with a broad brush. It realized the virtually unlimited scope of "human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990) (quoting SEC v. W.J. Howey Co., 328 U.S. 293, 299 (1946)).

### i. The Notes Sold By Defendants are Investment Contracts

Investment contracts are securities within the scope of the Securities Acts. An investment contract is a security if it involves (1) investment of money; (2) in a common enterprise; (3) with profits derived from others' efforts. SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946). This definition has been applied to a variety of situations, including pyramid schemes. See, e.g., Int'l Loan Network, Inc., 770 F. Supp. 678, 692 (D.D.C. 1991). Some jurisdictions interpret the phrase "common enterprise" differently and require additional analysis such as horizontal or vertical commonality. However, the Tenth Circuit has specifically rejected a rigid horizontal commonality test. See McGill v. American Land & Exploration Co., 776 F.2d 923, 925-26 (10th Cir. 1985). Instead, the court looks to the "economic reality" of the transaction. Id. Thus, if a "transaction is in reality an investment (that is, a transaction of a type in which stock is often given), then it creates a 'common enterprise' or a 'security.'" Id. (citations omitted).

Here, the note-holders invested money with the Defendants. The funds were pooled in a common enterprise. Indeed, Smart's attorney sent a letter on behalf of Smart to one of his investors assuring her that her "funds are placed along with others, in a pool

for investments." And Lee was issued "membership certificates" for 200,000 units of Smart Assets in return for her investment in the Defendants' notes.

The Defendants' promissory notes are not merely loan agreements. These notes were "not loans for commercial purposes, but were investment payouts disguised beneath the façade of promissory notes. These notes are akin to a <u>Howey</u> investment contract." <u>SEC v. Better Life Club of Am., Inc.</u>, 995 F. Supp. 167, 174 (D.D.C. 1998). Moreover, the fact that Defendants offered a fixed rather than variable rate of return does not affect the investments' status as a security. <u>See</u> <u>SEC v. Edwards</u>, 540 U.S. 389, 397 (2004) (analyzing <u>Howey</u> and holding "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws"); <u>Stoiber v. SEC</u>, 161 F.3d 745, 750 (D.C. Cir. 1998) (holding fixed rate notes are securities); <u>Pollack</u>, 27 F.3d at 813 (noting fixed rate bonds are regulated as securities). Likewise, the short term of the notes also has no impact on whether the notes fall within the definition of a security. <u>See</u> <u>Wallenbrock</u>, 313 F.3d at 540 (explaining the exception for notes with maturity of less than nine months "applies only to commercial paper, defined by the Supreme Court as 'short-term, high quality instruments issued to fund current operations and sold only to highly sophisticated investors'"); <u>Better Life Club</u>, 995 F. Supp. at 174 (holding sixty and ninety day notes were securities). These investments are securities and subject to the antifraud provisions of the federal securities laws.

### ii. The Notes Defendants Sold are Securities Under <u>Reves</u>

According to the United States Supreme Court, notes are presumed to be securities unless the notes fall into certain judicially created categories that are plainly not securities or the notes bear a family resemblance to the notes in those categories. <u>Reves</u>, 494 U.S. 56

(1990).  The <u>Reves</u> Court identified four facts to be considered in determining whether a particular note is a security.  These four elements are:

> (1) the motivations that would prompt a reasonable seller and buyer to enter into [the transaction].  If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security" (2) the "plan of distribution" of the instrument (3) the reasonable expectations of the investing public [and] (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

<u>Id.</u> at 66-67.  None of the four factors is crucial and the failure of one will not automatically result in a Court's concluding that the note in question is not a security.  Rather, Courts take a balancing approach to determine whether, on the whole, the note looks more like a security than not.  <u>In re NBW Commercial Paper Litig.</u>, 813 F. Supp. 7, 10 at n.7 (D.D.C. 1992) (holding commercial paper was a security).

**a.  The Motivations of the Parties**

The first factor under <u>Reves</u> is an objective inquiry into the "'motivations that would prompt a reasonable seller and buyer to enter into' the transaction."  <u>SEC v. J.T. Wallenbrock & Assocs.</u>, 313 F.3d 532, 537 (9th Cir. 2002).  A note is more like a security "if the seller's purpose is to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate."  <u>Reves,</u> 494 U.S. at 66; <u>see also</u> <u>Pollack v. Laidlaw Holdings, Inc.</u>, 27 F.3d 808, 812 (2d Cir. 1994) ("The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security).").  Alternatively, a promissory note that "is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or

consumer purpose" will "less sensibly [be] described as a 'security.'"  <u>Reves</u>, 494 U.S. at 66.

The first factor puts the promissory notes comfortably in the category of a security. Here, the investors were not provided any information regarding any assets that purportedly backed up the promissory notes—other than the fact that some investors were told the money would be used for "real estate."  <u>See</u> <u>Wallenbrock</u>, 313 F.3d at 538 (lack of information regarding assets backing loan indicated investment for general business purposes).  In fact, the Notes indicated on their face that the notes were to be used for a "business purpose only."  Moreover, the attractive interest rate offered to investors suggests the Notes are securities.  <u>See</u> <u>Wallenbrock</u>, 313 F.3d at 538 (a promised interest rate above market rates suggested a security).  Here, the Notes offered an interest rate of 10% per month or more.  Again, suggesting the Notes are securities.

**b. The "Plan of Distribution" for the Instrument**

The second factor requires the examination of the plan of distribution of a note "to determine whether it is an instrument in which there is 'common trading for speculation or investment.'"  <u>Reves</u>, 494 U.S. at 66.  The terms of the promissory note made to the O'Briens, the Smiths, and Lee does not preclude trading in a secondary market, but it is highly unlikely that any notes have been resold or that any investors have contemplated reselling them.  Furthermore, the persons to whom the notes were sold appear to be limited to Smart's clients.  This one factor, however, does not rebut the presumption that the notes are securities.  In a case similar to the facts uncovered in this investigation, a person associated with a broker-dealer, Gerald Stoiber, approached thirteen customers and borrowed various sums of money to purportedly finance commodities trading in his own

account.  Stoiber executed unsecured promissory notes with terms of two to five years and fixed interest rates ranging from six to twelve percent.  The court found that the notes were securities.  See Stoiber v. SEC, 161 F.3d 745 (D.C. Cir. 1998).

### c.  The Reasonable Expectations of the Investing Public

Under the third Reves factor, this Court must consider "whether a reasonable member of the investing public would consider these notes as investments."  McNabb v. SEC, 298 F.3d 1126, 1132 (9th Cir. 2002).  The opinions of individual investors as to whether the notes are securities are irrelevant.  Id.  Such admissions add little, if anything, to the analysis.  Id. (citing Stoiber v. SEC, 161 F.3d 745, 751 (D.C. Cir. 1998)).  A reasonable investor would view the Promissory Notes as an investment.  The Notes specifically state that the funds will be used for business purposes and Smart told the investors that the funds would be used for further investments.  The investors understood that the monthly dividend payments would be made from the proceeds of that further investment.  A reasonable investor would view such a transaction as a security purchase.

### d.  Reduction of Risk

The final factor for the Court to assess is whether there are adequate risk-reducing factors such as an alternative regulatory scheme that would "significantly reduce[] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary."  Reves, 494 U.S. at 67.  Here, there are no risk-reducing factors or alternative regulatory schemes that would reduce the risk to the investors in this case.  There is no other alternative regulatory scheme to reduce this risk to investors.  In addition, it does not appear that there is any real, valuable collateral securing any of the notes, other than a note that appears to already have been in default.  Nor were the notes in any way

insured. Other than the federal securities laws, there are no other regulatory schemes that provide oversight of the issuance of the notes or Smart's handling of the notes. Accordingly, the facts under the fourth prong of the <u>Reves</u> test suggest that the promissory notes are securities.

**III.**     **Smart Made Untrue Statements and Omitted Material Facts**

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] prohibits persons, in the offer or sale of a security, from employing any device, scheme or artifice to defraud; obtaining money or property through materially false or misleading statements or omitting to state material facts; or engaging in any transaction, practice, or course of business which operates as a fraud or deceit.  <u>United States v. Naftalin</u>, 441 U.S. 768, 773 (1979).  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit similar conduct in connection with the purchase or sale of a security.  Section 10(b) was designed to prevent all manner of fraudulent practices.  <u>Chiarella v. U.S.</u>, 445 U.S. 222, 226 (1980); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 201 (1976); <u>Affiliated Ute Citizens of Utah v. U.S.</u>, 406 U.S. 128, 153 (1972); <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 186 (1963).

As underlined in the above findings of fact, the Commission has shown through undisputed evidence that Defendants made numerous misrepresentations and omissions to investors.  Among other things, Defendants omitted material facts by failing to inform investors that their money would be used for (1) Smart's personal expenses; (2) investment in high risk real estate ventures; (3) hard money loans; and (4) to pay other investors. Defendants omitted material facts by failing to inform investors that their money would be pooled together in one account.

Defendants misrepresented material facts when Smart told investors that their money would be invested in safe, principal-guaranteed investments including S & P index mutual funds. Defendants misrepresented material facts when Smart furnished investors with account statements that misstated the balance of their account and the interest rate earned on their account. Defendants misrepresented material facts when Smart furnished investors with product information sheets that misstated how their money was invested.

## IV.    **Defendants' Misrepresentations and Omissions are Material**

Information is material if a substantial likelihood exists that the facts would have assumed actual significance in the investment deliberations of a reasonable investor. Basic, Inc. v. Levinson, 485 U.S. 224 (1988). Misrepresentations regarding the use of investors' funds are material. See SEC v. Cochran, 214 F.3d 1261, 1268 (10th Cir. 2000) (information implicating the fair market value would be material to a reasonable investor); Everest Sec., Inc. v. SEC, 116 F.3d 1235, 1239 (8th Cir. 1997) (it would be material to an investor to know that the offering company's existing project had been abandoned, that none of its asset value was to be recouped.). Similarly, investors would consider it important to know their funds were being misappropriated and used for purposes other than those stated when solicited. SEC v. TLC Invs. & Trade Co., 179 F. Supp. 2d 1149, 1153 (C.D. Cal. 2001); see also SEC v. Smith, 2005 U.S. Dist. LEXIS 21427, at *15 (S.D. Ohio Sept. 27, 2005) (it is obvious that a reasonable investor would consider it important to know that his money would not be invested in bank stock but would instead be used for other purposes, such as to pay for credit card bills, car washes, dating services, and the expenses of other companies).

Here, the Commission has offered undisputed evidence that Defendants made misrepresentations regarding the use of the investors' funds and failed to disclose that their funds were being misappropriated and used for purposes other than those stated when their investments were solicited. There is a substantial likelihood that such information would have assumed actual significance in the investment deliberations of the Defendants' investors. Therefore, the Defendants' misrepresentations and omissions are material.

## V.        Defendants Acted with Scienter

Scienter is an element of violations of Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, but is not a required element of a violation of Sections 17(a)(2) or 17(a)(3) of the Securities Act. Aaron v. SEC, 446 U.S. 680, 696-97 (1980). The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst, 425 U.S. at 193. Reckless conduct has been held to satisfy the scienter requirement. Edward J. Mawod & Co., 591 F.2d at 595-97.

Here, the Commission has offered undisputed evidence that Defendants acted with the requisite scienter. Smart told investors that their investments would be allocated to low risk funds with principal-guaranteed protection. However, Smart knew that the money was either being invested in (1) real estate; (2) high risk companies; (3) hard money lending; or being used to (4) pay his own personal expenses. Smart knew that he gave investors false account statements and misleading product information sheets. Moreover, Smart repeatedly asserted his Fifth Amendment privilege when asked whether he intentionally misled investors in using these various artifices of fraud.

## VI.    **Defendants' Fraud Occurred In Connection With the Purchase or Sale of Securities**

As the Supreme Court recently reaffirmed, the "in connection with" requirement is to be construed broadly and flexibly to effectuate its remedial purposes.  <u>SEC v. Zandford</u>, 535 U.S. 813, 819 (2002) ("It has maintained that a broker who accepts payment for securities . . . or who sells customer securities with intent to misappropriate the proceeds, violates §10(b) and Rule 10b-5").  Thus, the "in connection with" requirement is satisfied when someone utilizes a device "that would cause reasonable investors to rely thereon" and "so relying, cause them to purchase or sell a corporation's securities."  <u>In re Carter-Wallace, Inc. Sec. Litig.</u>, 150 F.3d 153, 156 (2d Cir. 1998) (citing <u>SEC v. Tex. Gulf Sulphur Co.</u>, 401 F.2d 833, 860-62 (2d Cir. 1968) (Section 10(b) applies "whenever assertions are made . . . in a manner reasonably calculated to influence the investing public."); <u>SEC v. Savoy Indus., Inc.</u>, 587 F.2d 1149, 1171 (D.C. Cir. 1978) ("In connection with" requirement is satisfied when it can reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities "regardless of the motive or existence of contemporaneous transactions by or on behalf of the violator."); <u>see</u> <u>also</u> <u>In re Ames Dep't Stores, Inc. Stock Litig.</u>, 991 F.2d 953, 966 (2d Cir. 1993) ("[S]tatements which manipulate the market are connected to resultant stock trading."); <u>SEC v. Rana Research, Inc.</u>, 8 F.3d 1358, 1362 (9th Cir. 1993).  Moreover, the "in connection with" requirement is met regardless of whether or not Defendants invested the money in securities.  <u>See</u> <u>Zandford</u>, 535 U.S. at 819.  All that is required is that an investor would reasonably believe that they are investing in securities.  <u>Id.</u>

The Commission has presented undisputed evidence that Defendants' conduct in this case coincided with the sale of securities.  Defendants sold promissory notes, mutual

funds and other securities.  Smart's misrepresentations regarding the use of funds occurred in the course of selling the securities to investors.  Indeed, the investors would likely not have invested in Smart or Smart Assets without Smart's misrepresentations regarding the use and nature of their investments.   It does not matter that Defendants never invested the investor's money in mutual funds despite his statements that he would do so.  <u>See Zandford</u>, 535 U.S. at 819.

## VII.    <u>Defendants Used the Means and Instrumentalities of Interstate Commerce</u>

The Commission has shown undisputed evidence that Defendants used the requisite jurisdictional means to affect the fraud.  In <u>Pereira v. U.S.</u>, 347 U.S. 1, 8-9 (1954), the United States Supreme Court noted that it is sufficient if a defendant knows that the use of mail or of wire services was a reasonably foreseeable consequence of a scheme to satisfy the "jurisdictional means" element.  "All that is required to establish a violation of [Section 17(a), Section 10(b) or Rule 10b-5] is a showing that a means, instrumentality or facility of a kind described in the introductory language of th[e] section was used, and that in connection with that use an act of a kind described . . . occurred."  <u>Matheson v. Armbrust</u>, 284 F.2d 670, 673 (9th Cir. 1960), <u>cert. denied</u>, 365 U.S. 870 (1961); <u>accord</u>, <u>United States v. Tallant</u>, 547 F.2d 1291, 1297 (5th Cir. 1977), <u>cert. denied</u>, 434 U.S. 889 (1977).  Here, Defendants made use of the mails, the internet, and the telephone to solicit investments.  Funds were wired to the Defendants' bank accounts.  That is all that is required.

**VIII.  This Court Draws an Adverse Inference from Smart's Repeated Invocation of his Fifth Amendment Privilege**

After repeated postponements granted at the request of Smart and his lawyers, Smart was noticed for his Rule 30 deposition on June 3, 2009.  Smart failed to appear.  On the following day, Smart attended the Rule 30(b)(6) deposition of Smart Assets as the company's sole controlling member.  At the deposition, Smart asserted his Fifth Amendment privilege against self incrimination with regard to the majority of questions concerning the Commission's material allegations.

This Court draws an adverse inference against Smart based on his refusal to answer many substantive questions during his deposition and his assertion of the Fifth Amendment privilege.  The Supreme Court has held that, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).  "[A]s Mr. Justice Brandeis declared, speaking for a unanimous court . . . '[s]ilence is often evidence of the most persuasive character.'"  Id. at 319. (quoting United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-154 (1923)).  "'Failure to contest an assertion . . . is considered evidence of acquiescence . . . if it would have been natural under the circumstances to object to the assertion in question.'"  Id. (quoting United States v. Hale, 422 U.S. 171, 176 (1975)).

In Baxter, the state was entitled to an adverse inference against Palmigiano because of the evidence against him and his assertion of the Fifth Amendment privilege.  Similarly, in this case, the Commission is entitled to an adverse inference against Smart because the undisputed evidence demonstrates that Smart was the sole person responsible for the scheme to defraud investors by making material misrepresentations regarding how their

money would be used, and because Smart asserted his Fifth Amendment privilege refusing to answer questions regarding the scheme.

By asserting his privilege, Smart refused to answer questions regarding (1) the Smart account statements given to investors; (2) the product information sheet given to Brown; (3) the promissory notes that he sold to investors; (4) the membership certificate that he issued to Lee; (5) what he told investors when soliciting their investments; (6) how he invested investor money; (7) how he otherwise used investor money; (8) whether he told investors he was going to invest their money in safe, principal-guaranteed investments; (9) whether he used investor money for his own personal use; (10) whether he used investor money to invest in real estate; (11) whether he used investor money to invest in hard lending; (12) whether he misled investors regarding how he was going to use their money; (13) whether he commingled investor money in a single account; (14) whether he gave investors false and misleading account statements; (15) whether he gave investors false and misleading product information sheets; (16) whether he paid investors with other investor money; (17) whether he misled investors to think that he was affiliated with AIM after he left AIM; (18) whether he routinely misled investors regarding the status of their investments; (19) whether he transferred investor money into his personal checking account; (20) whether he used investor money to pay his mortgage; (21) whether he used investor money to pay his personal credit cards; (22) whether he used investor money to pay his wife's personal credit cards; (23) whether he used investor money to issue a $23,000 check to his wife; and (24) whether he orchestrated a scheme to defraud investors.

Smart's silence and failure to contest these assertions is evidence of his acquiescence to the fact that he knowingly and purposely defrauded investors. As such, this Court draws an adverse inference against Smart in this case.

## IX. The Comission is Entitled to the Injunctive, Disgorgement and Penalty Relief it Seeks

"Once a violation of the federal securities laws has been found, a district court 'has broad equitable power to fashion appropriate remedies.'" SEC v. Milan Capital Group, Inc., 2000 U.S. Dist. LEXIS 16204 at *28 (S.D.N.Y. 2000) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996)). The Commission has sought the following remedies against Smart: a permanent injunction against future violations of the federal securities laws, disgorgement and prejudgment interest on that amount, and a civil monetary penalty.

### A. Smart Shall Be Permanently Enjoined

The Commission has presented undisputed evidence that there is a substantial likelihood that Smart will continue to violate the federal securities laws if not enjoined. His conduct meets the statutory requirement of "proper showing" to establish the likelihood that he will violate securities laws in the future, thus demonstrating the need for a permanent injunction. The Court may grant permanent injunctions against future violations of the securities laws on a motion for summary judgment. Murphy, 626 F.2d at 655; SEC v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1365 (10th Cir. 1976); Geyser Minerals, 452 F.2d 876 (10th Cir. 1971). Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act grants to the Commission the authority to seek injunctive relief when it appears, upon proper showing, "that any person is engaged or is about to

engage in acts or practices constituting a violation of any provision [of the Acts]." 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1).

In remedial actions such as this case, the Commission appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975). Thus, it has long been established that the Commission, unlike private litigants, is not required to show risk of irreparable injury or balance of the equities in its favor to make the statutory "proper showing" for an injunction. SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990). In order to make the "proper showing" required by statute, the Commission must establish that there is a substantial likelihood of future violations. Pros Int'l, 994 F.2d at 769; Murphy, 626 F.2d at 655.

When determining the likelihood of future violations, the courts should evaluate the totality of the circumstances. Pros Int'l, 994 F.2d at 769; Murphy, 626 F.2d at 655. Foremost among these circumstances is the past illegal conduct of the defendant, from which the Court may infer the likelihood of future violations. Management Dynamics, 515 F.2d at 808. Past conduct amounting to "systematic wrong doing rather than an isolated occurrence" may be "particularly appropriate" for a permanent injunction. Milan Capital Group, 2000 U.S. Dist. LEXIS 16204 at 29, (citing First Jersey Sec., 101 F.3d at 1477 (internal citations omitted)). Furthermore, several factors used to determine the likelihood of future violations include "the seriousness of the violation, the degree of scienter, whether the defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." Pros Int'l, 994 F.2d at 769. No single factor is considered

dispositive when evaluating the likelihood of a future violation, but the degree of scienter does "bear heavily" on the decision. Id. (citing SEC v. Haswell, 654 F.2d 698, 699 (10th Cir. 1981)). Significantly, it is not necessary that the Commission prove the existence of every one of these factors to establish a proper showing and obtain an injunction. Murphy, 626 F.2d at 656 (factors are not individual prerequisites to issuance of a permanent injunction by summary judgment).

The egregious, systematic and widespread nature of Smart's conduct clearly demonstrates the need for a permanent injunction to deter future violations of the federal securities laws. Smart's actions were not a single incident or one-time occurrence, but rather a systematic program of deception and fraud perpetrated over several years. Smart is young, and left unrestrained, will have ample time and opportunity to devise another securities scheme. His victims do not have such luxury of time and opportunity, and may never financially recover.

The long term and ever-changing nature of Smart's deception demonstrates that Smart is likely to invent new fraudulent schemes to defraud. Consequently, given Smart's conduct, the high degree of scienter he demonstrated, the likelihood that Smart could again engage in violations of the securities laws, and that lack of remorse that he has demonstrated, this Court shall permanently enjoin Smart from violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**B. Smart Shall Be Ordered to Disgorge His Ill-Gotten Gains**

It is well settled that the Commission may seek and the courts may order disgorgement of ill-gotten gains in Commission-instigated injunctive actions. SEC v.

Rind, 991 F.2d 1486, 1493 (9th Cir. 1993); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).  "[A]ctions for disgorgement of improper profits are equitable in nature."  Rind, 991 F.2d at 1493 (citing Chauffeurs, Teamsters & Helpers, Local 391 v. Terry, 494 U.S. 558, 570 (1990)).  The purpose of disgorgement is to prevent unjust enrichment.  Id.  By depriving violators of their ill-gotten gains, disgorgement effectuates the deterrence objective of the securities laws.  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996).  Furthermore, the amount of disgorgement should include all gains flowing from illegal activities and "need only be a reasonable approximation of profits causally connected to the violation."  Id. at 1475 (quoting SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995)); SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998).

Moreover, the amount of disgorgement should not include any offset for the operating expenses of Smart Assets.  SEC v. JT Wallenbrock & Assocs., 2006 U.S. App. LEXIS 5949, at *11 (9th Cir. March 10, 2006) (concluding "it would be unjust to permit the defendants to offset against the investor dollars they received the expenses of running the very business they created to defraud those investors into giving the defendants the money in the first place").  "Neither the deterrent purpose of disgorgement nor the goal of depriving a wrongdoer of unjust enrichment would be served were we to allow these defendants—who defrauded investors . . . to 'escape disgorgement by asserting that expenses associated with this fraud were legitimate.'"  Id. at *15 (quoting SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 16 (D.D.C. 1998)).

The Commission is entitled to full disgorgement and prejudgment interest in order to deter Smart—and other potential violators—from future violations of the securities laws

and make his victims whole to the fullest extent practicable.  The Commission presented undisputed evidence that Smart misappropriated $2,059,077 from investors.  Thus, the Commission is entitled to an order of disgorgement in the amount of $2,059,077 plus prejudgment interest of $597,426 for a total of $2,656,503.

### C.  The Court Shall Impose a Civil Monetary Penalty against Smart

Pursuant to Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act, the Commission may seek civil penalties for violations of the federal securities laws.  15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3).  Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar misconduct in the future.  Accordingly, the factors considered to determine the likelihood of future violations for the purposes of a permanent injunction are also useful in assessing civil penalties.  SEC v. Brethen, 1992 U.S. Dist. LEXIS 20665 at *104 (S.D. Ohio 1992).  When determining the appropriate civil penalty to impose, the Brethen court recognized and examined three salient factors identified originally in SEC v.Youmans, (i) the egregiousness of the violations, (ii) the isolated or repeated nature of the violations, and (iii) the degree of scienter involved.  SEC v. Youmans, 729 F.2d 413, 415 (6th Cir. 1984).  See also SEC v. Deyon, 977 F. Supp. 510, 519 (D. Me. 1997) (imposing $75,000 penalty against defendant based on his "fraudulent" conduct); SEC v. Custable, 1996 U.S. Dist. LEXIS 19321 **13-14 (N.D. Ill. 1996) (imposing a civil penalty of $60,000, less than the maximum penalty, based in part on defendant's cooperation during the course of litigation).

A third-tier penalty is appropriate where the violations (1) involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement", and (2)

"directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(c); 78u(d)(3)(b)(iii).

Furthermore, in determining whether to assess civil penalties, a court may consider evidence of a defendant's overall conduct, including conduct that is not directly related to the violations at issue. For example, in <u>SEC v. Moran</u>, 944 F. Supp. 286, 296 (S.D.N.Y. 1996), the court considered the defendant's refusal to recognize the seriousness of his violations in deciding to impose civil penalties under the remedies act.

The undisputed facts show that Smart repeatedly induced investors to participate in his systematic program of deception and fraud. Although he knew investor money was being misappropriated and used contrary to the representations made to clients, Smart continued to solicit investors and take their money. Smart's high level of scienter is further evidenced by the fact that he targeted elderly investors in need of safe, highly liquid investments for retirement. Smart would misrepresent to prospective investors regarding how he was going to invest their money. After the money was handed over to Smart, he would use it for a myriad of personal expenses and would squander the money on fruitless, high risk investments. Also, Smart provided clients with fabricated accounts statements and product information sheets, which wholly misrepresented how the money was being used.

Smart has shown no recognition of his wrongdoing and has not provided any assurances that he will not defraud investors again. As such, this Court shall grant the Commission's request for civil penalties as well as a permanent injunction and disgorgement. Smart shall pay the maximum third tier penalty which provides for a penalty in the amount of $2,059,077, or $100,000 per violation by Smart and $500,000 per

violation by Smart Assets, LLC, or such other amount as the Commission may submit by further motion.

**X.**    <u>**Conclusion**</u>

Based on the forgoing, and for the reasons set forth in the Commission's memoranda, there is no genuine issue of material fact separating the parties in this action. The record contains undisputed evidence that Smart violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.   The Court will enter separate Orders regarding these two motions.

DATED this 6th day of June, 2011.

Dale A. Kimball
United States District Court Judge